IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JAGDISH CHAND,

      Plaintiff,                 No. CIV S-08-0217 DAD

   vs.

MICHAEL J. ASTRUE,          <u>ORDER</u>
Commissioner of Social Security,

      Defendant.

_____/

      This social security action was submitted to the court without oral argument for ruling on plaintiff's motion for summary judgment and defendant's cross-motion for summary judgment.  For the reasons explained below, the court will affirm the decision of the Commissioner of Social Security (Commissioner).

**PROCEDURAL BACKGROUND**

      Plaintiff applied for Disability Insurance Benefits under Title II of the Social Security Act (Act) on March 7, 2005,[1] claiming disability based on a spinal cord injury with an

---

[1] The ALJ's decision and defendant's summary judgment motion indicate that plaintiff filed his application on February 16, 2005.  (Tr. at 11; Def't's Mot. for Summ. J., Mem. of P. & A. at 1 (citing tr. at 65-67).)  However, the pages of the record cited by defendant reflect an application filing date of March 7, 2005.

alleged onset date of January 17, 2002.[2]  (Transcript (Tr.) at 65-76.)  The application was denied initially on June 16, 2005, and upon reconsideration on January 23, 2006.  (Tr. at 11, 25-26, 33-37, 40-44.)  Pursuant to plaintiff's timely request, a hearing was held before an administrative law judge (ALJ) on April 26, 2007.  (Tr. at 32, 347-79.)  Plaintiff, represented by Richard Shore, Esq., testified at the hearing, as did a vocational expert.  (Tr. at 348.)  In a decision dated June 5, 2007, the ALJ entered the following findings:

> 1.  The claimant meets the insured status requirements of the Social Security Act through March 31, 2007.
>
> 2.  The claimant has not engaged in substantial gainful activity since January 17, 2002, the alleged onset date (20 CFR 404.1520(b) and 404.1571 *et seq*.).
>
> 3.  The claimant has the following severe impairments: status post lumbar fusion L4-five; degenerative disc disease of the lumbar sacral spine (20 CFR 404.1520(c)).
>
> 4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
>
> 5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity [to] perform light exertional work activity involving simple reading and writing, lifting occasionally up to 20 pounds, frequent lifting up to 10 pounds, sitting for six of eight hours, standing six of eight hours, and no climbing of ladders, ropes, scaffolds, and he is limited in kneeling, crouching and crawling, and the various other demands inherent with the requirements of light work.
>
> 6.  The claimant is capable of performing his past relevant work as a cashier.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

/////

/////

---

[2]  According to plaintiff's motion for summary judgment, the ALJ found that plaintiff had not performed substantial gainful activity "since March 15, 2005, the amended onset date." (Pl.'s Mot. for Summ. J. at 17 (citing tr. at 13-15).)  The court finds no reference to an amended onset date in either the ALJ's decision or elsewhere in the record.

1      7.  The claimant has not been under a disability, as defined in the
Social Security Act, from January 17, 2002 through the date of this
2      decision (20 CFR 404.1520(f)).

3  (Tr. at 13-18.)

4      On November 28, 2007, the Appeals Council denied plaintiff's request for

5  administrative review of the ALJ's decision.  (Tr. at 3-5.)  Plaintiff sought judicial review

6  pursuant to 42 U.S.C. § 405(g) by filing the complaint in this action on January 29, 2008.

7                   **LEGAL STANDARD**

8      The Commissioner's decision that a claimant is not disabled will be upheld if the

9  findings of fact are supported by substantial evidence in the record as a whole and the proper

10  legal standards were applied.  Schneider v. Comm'r of the Soc. Sec. Admin., 223 F.3d 968, 973

11  (9th Cir. 2000); Morgan v. Comm'r of the Soc. Sec. Admin., 169 F.3d 595, 599 (9th Cir. 1999).

12  The findings of the Commissioner as to any fact, if supported by substantial evidence, are

13  conclusive.  Miller v. Heckler, 770 F.2d 845, 847 (9th Cir. 1985).  Substantial evidence is

14  such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

15  Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2001) (citing Morgan, 169 F.3d at 599); Jones

16  v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985) (citing Richardson v. Perales, 402 U.S. 389, 401

17  (1971)).

18      A reviewing court must consider the record as a whole, weighing both the

19  evidence that supports and the evidence that detracts from the ALJ's conclusion.  Jones, 760 F.2d

20  at 995.  The court may not affirm the ALJ's decision simply by isolating a specific quantum of

21  supporting evidence.  Id.; see also Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If

22  substantial evidence supports the administrative findings, or if there is conflicting evidence

23  supporting a finding of either disability or nondisability, the finding of the ALJ is conclusive,

24  Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987), and may be set aside only if an

25  improper legal standard was applied in weighing the evidence, Burkhart v. Bowen, 856 F.2d

26  1335, 1338 (9th Cir. 1988).

1    In determining whether or not a claimant is disabled, the ALJ should apply the

2  five-step sequential evaluation process established under Title 20 of the Code of Federal

3  Regulations, Sections 404.1520 and 416.920.  Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).

4  The five-step process has been summarized in the Ninth Circuit as follows:

> Step one:  Is the claimant engaging in substantial gainful activity?
> If so, the claimant is found not disabled.  If not, proceed to step
> two.
>
> Step two:  Does the claimant have a "severe" impairment?  If so,
> proceed to step three.  If not, then a finding of not disabled is
> appropriate.
>
> Step three:  Does the claimant's impairment or combination of
> impairments meet or equal an impairment listed in 20 C.F.R., Pt.
> 404, Subpt. P, App. 1?  If so, the claimant is automatically
> determined disabled.  If not, proceed to step four.
>
> Step four:  Is the claimant capable of performing his past work?  If
> so, the claimant is not disabled.  If not, proceed to step five.
>
> Step five:  Does the claimant have the residual functional capacity
> to perform any other work?  If so, the claimant is not disabled.  If
> not, the claimant is disabled.

15  Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

16    The claimant bears the burden of proof in the first four steps of the sequential

17  evaluation process.  Yuckert, 482 U.S. at 146 n.5.  The Commissioner bears the burden if the

18  sequential evaluation process proceeds to step five.  Id.; Tackett v. Apfel, 180 F.3d 1094, 1098

19  (9th Cir. 1999).

20                                    **APPLICATION**

21    Plaintiff advances the following three arguments in support of his motion for

22  summary judgment:  (1) the ALJ failed to properly characterize and analyze the opinions of

23  treating and examining physicians, without a legitimate basis for so doing; (2) the ALJ failed to

24  properly evaluate and credit plaintiff's statements regarding the nature and extent of his pain and

25  functional limitations; and (3) the ALJ failed to properly assess plaintiff's residual functional

26  capacity, failed to include all of plaintiff's limitations in the hypothetical question posed to the

4

vocational expert, failed to ask the vocational expert whether his testimony conflicted with the Dictionary of Occupational Titles and, as a result of these errors, found plaintiff capable of performing his past work as a cashier.  Plaintiff's arguments challenge the ALJ's determinations at step four of the sequential evaluation process.  Each argument is addressed below.

**I.  Step Four Analysis of Residual Functional Capacity In General**

A claimant's residual functional capacity (RFC) is "the most [the claimant] can still do despite [his or her] limitations."  20 C.F.R. § 404.1545(a).  The assessment of a claimant's RFC must be "based on all the relevant evidence in [the claimant's] case record."  Id. See also Mayes v. Massanari, 276 F.3d 453, 460 (9th Cir. 2001).  When a claimant requests an administrative hearing, it is the duty of the ALJ to determine the claimant's RFC from the record. 20 C.F.R. § 404.1546(c).

In the present case, the ALJ found that plaintiff has the following RFC arising from his severe impairments of status post-lumbar fusion L4-five and degenerative disc disease of the lumbar sacral spine:  ability to lift up to 20 pounds occasionally; ability to lift up to 10 pounds frequently; ability to sit for 6 of 8 hours; ability to stand for 6 of 8 hours; inability to do any climbing of ladders, ropes, or scaffolds; and ability to do limited kneeling, crouching, and crawling.  (Tr. at 15.)  On the basis of these findings, the ALJ determined that plaintiff can perform light exertional work activity involving simple reading and writing.  (Id.)  The ALJ concluded that plaintiff is unable to perform his past work as a laundry runner but is able to perform his past relevant work as a cashier, as generally performed.  (Tr. at 17.)

**A.  Opinions of Treating and Examining Physicians**

Plaintiff contends that the ALJ arrived at a flawed RFC determination in part because he failed to properly characterize and discuss the opinions of one of plaintiff's treating physicians and the two examining physicians.

The weight to be given to medical opinions in Social Security disability cases depends in part on whether the opinions are proffered by treating, examining, or nonexamining

1  health professionals.  Lester, 81 F.3d at 830; Fair v. Bowen, 885 F.2d 597, 604 (9th Cir. 1989).

2  "As a general rule, more weight should be given to the opinion of a treating source than to the

3  opinion of doctors who do not treat the claimant." Lester, 81 F.3d at 830.  This is so because a

4  treating doctor is employed to cure and has a greater opportunity to know and observe the patient

5  as an individual.  Smolen v. Chater, 80 F.3d at 1273, 1285 (9th Cir. 1996); Bates v. Sullivan, 894

6  F.2d 1059, 1063 (9th Cir. 1990).

7          A treating physician's uncontradicted opinion may be rejected only for clear and

8  convincing reasons, and an opinion controverted by another doctor may be rejected only for

9  specific and legitimate reasons supported by substantial evidence in the record.  Lester, 81 F.3d

10  at 830-31.  In order to meet the burden of setting forth specific, legitimate reasons for giving less

11  weight to the controverted opinion of a treating physician, the ALJ must set out a detailed and

12  thorough summary of the facts and conflicting clinical evidence, explain his interpretation of the

13  evidence, and make specific findings.  Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002).

14  In developing the record and interpreting the evidence, the ALJ must explain why any significant

15  probative evidence has been rejected and must reach a decision supported by substantial

16  evidence.  Howard v. Barnhart, 341 F.3d 1006, 1012 (9th Cir. 2003); Vincent v. Heckler, 739

17  F.2d 1393, 1394-95 (9th Cir. 1984).

18          "The opinion of an examining physician is, in turn, entitled to greater weight than

19  the opinion of a nonexamining physician." Lester, 81 F.3d at 830.  An examining physician's

20  uncontradicted opinion, like a treating physician's, may be rejected only for clear and convincing

21  reasons, and when an examining physician's opinion is contradicted by another doctor, the

22  opinion may be rejected only for specific and legitimate reasons supported by substantial

23  evidence in the record.  Id. at 830-31.  "The opinion of a nonexamining physician cannot by itself

24  constitute substantial evidence that justifies the rejection of the opinion of either an examining

25  physician or a treating physician."  Id. at 831 (emphasis in original).  See id. at 831-32 (holding

26  that the ALJ's rejection of the opinions of a treating physician and an examining psychologist

1  was not warranted where the rejection was based on a nontreating, nonexamining doctor's

2  opinion supplemented only by unsupported and unwarranted speculation that the treating and

3  examining doctors were misrepresenting the claimant's condition or were not qualified to

4  evaluate it); Pitzer v. Sullivan, 908 F.2d 502, 506 (9th Cir. 1990) (holding that the nonexamining

5  doctor's opinion "with nothing more" did not constitute substantial evidence for rejecting the

6  opinions of treating or examining physicians); Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir.

7  1984) (holding that the report of the nontreating, nonexamining doctor, even when combined

8  with the ALJ's own observation of the claimant at the hearing, did not constitute substantial

9  evidence and did not support the ALJ's decision to reject the examining physician's opinion that

10 the claimant was disabled).

11         Here, plaintiff argues that (1) the ALJ mischaracterized the opinions of treating

12 physician Dr. Howard with regard to plaintiff's RFC, erroneously finding them similar to those

13 of Dr. Kumar, the consultative examining physician; (2) the ALJ's description of Dr. Kumar's

14 report omitted test results which revealed that plaintiff is legally blind in his right eye, and the

15 specification that plaintiff's ability to sit is unlimited only "with proper supportive chair"; (3) the

16 ALJ did not include the opinions of Dr. Steiner, the workers compensation examining physician,

17 that plaintiff's surgery was essentially a failed surgery, that plaintiff is limited to "semi-

18 sedentary" work, and that plaintiff was not able to find work because his previous work

19 experience and current level of disability narrowed his ability to seek employment within his

20 physical capabilities; (4) the ALJ failed to mention that on September 24, 2004, Monterey Bay

21 Urgent Care, a treating provider, limited plaintiff to no lifting over 5 pounds; (5) the ALJ failed

22 to mention Dr. Li's March 2003 opinion that plaintiff was limited to lifting no more than 10

23 pounds; and (6) Dr. Kumar and the Social Security reviewing physicians were the only

24 physicians who found plaintiff able to lift 10 pounds frequently and 20-25 pounds occasionally,

25 while all other treating or examining physicians found plaintiff limited to lifting 10 pounds.

26 /////

After careful consideration of the record, the court finds that the ALJ did not fail to properly credit the opinions of the treating and examining physicians.  As an initial matter, the court finds that plaintiff is mistaken regarding an alleged 5-pound limit on lifting imposed by Monterey Bay Urgent Care in 2004.  There are no treatment records from Monterey Bay Urgent Care for 2004.  (See tr. at 127-28.)  The records cited by plaintiff in support of this argument are dated September 18 & 24, 2001, just weeks after plaintiff's work injury on August 6, 2001.[3]  (Tr. at 129-32.)  While the records of treatment in 2001 are part of plaintiff's medical history, they are not probative evidence of plaintiff's RFC from plaintiff's alleged disability onset date of January 17, 2002, through the ALJ's decision on June 5, 2007.

Turning to plaintiff's other arguments, the court reiterates that because a claimant's RFC is the most he can still do despite his limitations, that assessment by the ALJ must be based on all relevant evidence in the record.  The record in this case includes medical records from the date of plaintiff's work injury on August 6, 2001 to March 8, 2007, a span of more than five and a half years.  During that time, plaintiff was treated by more than half a dozen medical professionals and was examined by two more.  Many impressions were noted, many opinions were expressed, and many limitations were imposed on plaintiff at various stages of plaintiff's treatment.  As set forth more fully infra, those medical records contain substantial evidence supporting the ALJ's characterization of the opinions of the treating and examining physicians.

Plaintiff was treated by Timothy Wilken, M.D., at Monterey Bay Urgent Care from August 6, 2001, until September 24, 2001, when Dr. Wilken referred plaintiff to Mark W. Howard, M.D., an orthopedic surgeon, for further treatment.  (Tr. at 129.)  On October 5, 2001,

---

[3]  The record reflects that plaintiff was treated at Monterey Bay Urgent Care from the day of his injury through September 24, 2001, when Timothy Wilken, M.D., referred plaintiff to Dr. Howard to assume management of plaintiff's care.  (Tr. at 129-54.)  The September 24, 2001 medical status report and referral reflect that plaintiff was instructed to return to modified work at that time with no lifting over five pounds.  (Tr. at 129.)

Dr. Howard performed a comprehensive orthopedic spine surgical evaluation of plaintiff and completed a form indicating that plaintiff could return to modified work if it did not involve lifting greater than 25 pounds or repeated bending and stooping.  (Tr. at 253-55.)  Dr. Howard treated plaintiff from October 5, 2001, through February 24, 2003, a period of 17 months.  (Tr. at 193-95, 200-09, 215-38, 241, 245-46, 253-63.)  Early on, Dr. Howard referred plaintiff to a physical therapist and to Central Coast Pain Institute (CCPI).  (Tr. at 254.)

In accordance with Dr. Wilken's and then Dr. Howard's instructions in 2001, plaintiff returned to work, where he performed light duties, such as answering phones.  (Tr. at 71.)  Plaintiff stopped working on January 17, 2002, his onset-of-disability date, due to pain in his lower back and right leg.  (Id.)  On January 30, 2002, Dr. Howard noted that plaintiff

> understands that at this point, now approaching 6 months post-injury, in that he's currently out of work, has persistent disability, and has to date failed rehab and injection pain management conservative care, he does have options.  Those include living with what he has and taking whatever pills help, and probably pursuing vocational rehabilitation or a different line of work.  The other option is a more definitive undertaking, in his case an L4-5 arthrodesis stabilization, most likely with lumbar interbody fusion.
>
> We discussed that procedure in detail and he understands the appropriate expectations related thereto, specifically, the **best** we would hope for is an up to 80% chance of relieving up to 80% of the pain, and it's a realistic and frequent expectation to obtain only 50% improvement and consider this an acceptable degree of relief.

(Tr. at 245 ) (emphasis in original).  On March 19, 2002, Dr. Howard performed lumbar spinal surgery on plaintiff.  (Tr. at 229-37.)

Dr. Howard had initially restricted plaintiff to no lifting over 25 pounds.  (Tr. at 254-55.)  That restriction was unchanged until plaintiff was deemed totally temporarily disabled in preparation for and during recovery from surgery.  (Tr. at 226.)  On July 1, 2002, plaintiff was declared totally temporarily disabled to July 15, 2002, at which time he was authorized to return to work if light work, defined in part as work requiring a minimum of demands for physical effort, was available.  (Tr. at 223.)  On September 4, 2002, plaintiff was authorized to return to

work if sedentary work, also defined in part as requiring a minimum of demands for physical effort, was available.  (Tr. at 218, 221.)  On October 16, 2002, plaintiff was authorized to return to modified work, with no lifting over 25 pounds and no repetitive bending, stooping, or squatting.  (Tr. at 216-17.)

On November 26, 2002, despite reporting pain intensity at level 7 on a scale of 0 to 10, plaintiff felt capable of returning to his regular duties as a laundry runner.  (Tr. at 208-09.)  Dr. Howard found that the most recent x-rays "looked good."  (Tr. at 208.)  Because plaintiff felt "capable and ready to go back to his regular and standard work duties as a laundry runner," Dr. Howard authorized him to do so.  (Id.)  Dr. Howard anticipated that "certainly by 1 year postoperatively he and I will be able to make a definitive decision whether or not he'll be able to return to that line of work, or is a Qualified Injured Worker and in need of vocational rehabilitation."  (Id.)

On December 2, 2002, Dr. Howard noted that plaintiff "returned to work just one day last week and subsequent to that has had a marked increase in pain."  (Tr. at 205.)  Dr. Howard found that plaintiff was totally temporarily disabled from December 2, 2002 to January 14, 2003.  (Tr. at 205-06.)  He took plaintiff off work for work hardening physical therapy and continued swim/aqua therapy.  Dr. Howard planned to continue with conservative care and pain medications as needed.  (Id.)  On January 13, 2003, Dr. Howard determined that plaintiff could return to light duty with no lifting over 10 pounds, no repetitive bending, stooping, or squatting, and no sitting or standing for more than 2 hours without a 15-minute break.  (Tr. at 201-02.)

On February 24, 2003, Dr. Howard determined that no additional surgery was needed and issued his treating physician's final permanent and stationary disability report.  (Tr. at 194-95, 203.)  He opined that plaintiff's disability precludes him from performing heavy work, which means, for purposes of state workers compensation, that plaintiff has lost approximately 50% of his pre-injury capacity for performing such activities as bending, stooping, lifting,

/////

pushing, pulling, and climbing.[4]  (Tr. at 194, 203.)   Dr. Howard stated that plaintiff could not

perform his job as laundry runner unless permanent workplace modifications were made and that

otherwise plaintiff would be a candidate for vocational rehabilitation.  (Tr. at 194.)  He

recommended ongoing rehabilitation-oriented conservative care, including spinal

stabilization/mobilization, general conditioning, stretching/strengthening, and swim/aqua

therapy, to be pursued on a self-directed, self-procured basis by means of a swim club or gym

membership, with periodic courses of formal rehabilitation physical therapy and continued pain

management care.  (Id.)  He recommended transfer of plaintiff's care to Dr. Rosen.  (Tr. at 194.)

The workers compensation rating form does not include a specific weight restriction on lifting,

and Dr. Howard did not indicate such a restriction in his written report.  (Tr. at 194-95, 203.)

Between November 2001 and April 2003, plaintiff was treated for pain at CCPI by

Howard Rosen, M.D., and, on one occasion, by his colleague Victor Li, M.D.  (Tr. at 187-92,

197-99, 210-14, 239-40, 242-44, 247-52.)  While plaintiff was being treated by Dr. Howard, no

work restrictions were noted by Dr. Rosen.  In treatment notes for February 10, 2003, February

26, 2003, and March 25, 2003, after Dr. Howard had indicated his intention to issue a final report

in February, Dr. Rosen and Dr. Li reiterated the work restrictions imposed by Dr. Howard on

January 13, 2003, including the 10-pound limit on lifting.  (Tr. at 190, 192, 198.)

In response to a letter from plaintiff's workers compensation attorney, Dr. Rosen

opined in April 2003 that, given the extensive nature of plaintiff's surgery, it was not realistic to

anticipate that plaintiff would be able to carry 125 pounds multiple times per hour in an eight-

hour work day, but he suggested that the question of whether plaintiff would ever be able to

return to his job as laundry runner would be best answered by plaintiff's surgeon.  (Tr. at 187-

---

[4]  "A disability precluding heavy work" is one of eleven ratings for permanent disabilities for purposes of state workers compensation.  (See tr. at 203.)  A disability precluding heavy work "contemplates the individual has lost approximately 50% of his pre-injury capacity for performing such activities as bending, stooping, lifting, pushing, pulling and climbing or other activities involving comparable physical effort.  Subjectively this disability results from constant slight to moderate pain."  (Tr. at 203.)

88.)  Although no longer treating plaintiff, Dr. Howard examined him on June 19, 2003, and stated that his thoughts regarding plaintiff's ongoing care were unchanged from February 24, 2003.  Noting a prominent keloid near plaintiff's incision scar and tenderness, Dr. Howard referred plaintiff for evaluation and treatment of keloid/scar-tissue-related pain.  (Tr. at 186-87.)

Pursuant to Dr. Howard's referral, plaintiff was seen and treated by plastic surgeon David T. Morwood, M.D., from September 10, 2003 to January 5, 2004 for scar-tissue and keloid-related pain.  (Tr. at 266-72.)  On November 17, 2003, Dr. Morwood found "profound improvement" and indicated that light work was "okay now," with regular work possible in three months.  (Tr. at 268-69.)  On January 5, 2004, Dr. Morwood found plaintiff's scar tissue and keloids "markedly improved" and "much better."  (Tr. at 266.)  He continued plaintiff on light duty, to return to regular work in six weeks.  (Tr. at 266-67.)  He noted that plaintiff did not have another doctor following his care and advised plaintiff that he needed such a doctor.  (Tr. at 266.)

Between January 5, 2004 and November 15, 2005, the record does not reflect that plaintiff received any medical treatment.  During that period, plaintiff was examined on May 26, 2004, by Robert Steiner, M.D., who prepared a medical-legal evaluation for plaintiff's workers compensation case.  (Tr. at 277-82.)  Dr. Steiner noted that plaintiff had no treating physician, was not taking medication other than occasional Tylenol, and used Ben Gay.  (Tr. at 278.)  Plaintiff reported constant back pain, extending to his right leg with constant numbness over his right foot; he also reported inability to sit for long periods and difficulty standing and walking; plaintiff stated that he avoided repetitive bending or heavy lifting from waist level and did not do any lifting from ground level.  (Id.)  Dr. Steiner observed that plaintiff walked with a protective gait, had a 50% loss of forward flexion and a 50% loss of extension, had tenderness over the apparent donor graft site, performed straight leg raising to 90 degrees without back or leg complaints, could not squat, and had tenderness and spasm in the lower lumbar segments.  (Tr. at 279-80.)  Dr. Steiner concluded that plaintiff's disability was best described as a limitation to /////

"Semi-Sedentary Work."[5]  (Tr. at 281.)  He explained that plaintiff's poor surgical result and current presentation supported a conclusion that his disability was greater than that of limitation to light work.[6]  (Tr. at 282.)

At the request of plaintiff's workers compensation attorney, Dr. Steiner reviewed additional medical records, including Dr. Morwood's treatment notes, and issued a supplemental report on June 21, 2004.  (Tr. at 273-76.)  He noted Dr. Morwood's indication that on January 5, 2004, plaintiff could return to light duty.  (Tr. at 275.)  He also noted a February 25, 2003 physical therapy evaluation describing plaintiff's level of function as 62%.  Dr. Steiner stated that, in his opinion, 62% was not a satisfactory result.  (Id.)  He concluded that his previous disposition was appropriate and that plaintiff's level of disability was consistent with a limitation to semi-sedentary work.  (Tr. at 276.)

In August 2004, Dr. Howard was provided with additional documents to consider, including Dr. Steiner's evaluations.  (Tr. at 285.)  Based on the additional records, Dr. Howard amended his previous rating from "disability precluding heavy work" to "limitation to light work."  (Id.)  He did not find plaintiff limited to semi-sedentary work.

After plaintiff applied for Social Security disability benefits in 2005, a consultative examination was obtained.  On May 9, 2005, Rajeswari Kumar, M.D., performed a complete orthopedic evaluation of plaintiff.  (Tr. at 287-93.)  Plaintiff reported that his symptoms had improved after surgery, therapy, and medications, but he continued to have constant low back pain radiating down to his right lower extremity, with occasional numbness in the right leg.

_____

[5]  The term "Semi-Sedentary Work" for state workers compensation purposes "contemplates the individual can do work approximately one-half the time in a sitting position, and approximately one-half the time in a standing or walking position, with a minimum of demands for physical effort for standing, walking or sitting."  (Tr. at 203.)

[6]  The term "Light Work" for state workers compensation purposes "contemplates the individual can do work in a standing or walking position, with a minimum of demands for physical effort.  This individual has constant moderate pain which causes a marked handicap in the performance of the activity."  (Tr. at 203.)

(Tr. at 287.)  He stated that the pain was aggravated with 15 minutes of standing, walking three to four blocks, bending, or lifting.  He was using a back brace all the time for pain relief and was taking over-the-counter medications as needed.  (Tr. at 287-88.)  Plaintiff's gait was normal, and he did not use an assistive device to ambulate.  (Tr. at 288.)  A lumbar spine examination revealed no muscle spasm of the paravertebral musculature, some tenderness in the lumbar paraspinal region and the right upper gluteal region, normal spinal contour, and no scoliosis.  (Tr. at 289.)  Based on plaintiff's statements, a review of x-ray reports and the surgeon's operative report, observations of plaintiff's movements and actions during the interview and physical examination, and the formal physical examination procedures, Dr. Kumar found that plaintiff can lift 25 pounds occasionally and 10 pounds frequently; can do occasional bending and stooping activities; can stand and walk six hours of out of eight per day without an assistive device; can sit for an unlimited time with a proper supportive chair; upper extremity activities are unlimited; kneeling and climbing activities are unlimited.  (Tr. at 290-91.)

On June 2, 2005, Patrick Bianchi, a state agency physician, reviewed the record and prepared a Physical Residual Functional Capacity Assessment form for the period from January 2002 to June 2, 2005.  (Tr. at 294-301.)  Dr. Bianchi found the following exertional limitations:  occasional[7] lifting and carrying of 20 pounds; frequent[8] lifting and carrying of 10 pounds; standing and/or walking, with normal breaks, for about six hours in an eight-hour workday; sitting, with normal breaks, for a total of about six hours in an eight-hour workday; and unlimited pushing and/or pulling, except as limited by the restrictions on lifting and carrying.  (Tr. at 295.)  Dr. Bianchi found that plaintiff was limited to occasional performance of postural activities, i.e., climbing (ramps, stairs, ladders, ropes, and scaffolds), balancing, stooping, kneeling, crouching, and crawling.  (Tr. at 296.)  No manipulative, visual, communicative, or

---

[7]  The form states that "occasionally" means one-third of the time or more.  (Tr. at 295.)

[8]  The form defines "frequently" as two-thirds of the time or more.

1   environmental limitations were found.  (Tr. at 297-98.)  Dr. Bianchi opined that plaintiff's

2   symptoms are attributable to a medically determinable impairment but that plaintiff was only

3   partially credible because of findings – such as normal gait – that did not show significant

4   impairment.  (Tr. at 299.)  In Dr. Bianchi's opinion, there were no treating or examining source

5   conclusions about plaintiff's limitations that were significantly different from his.  (Tr. at 300.)

6   Dr. Bianchi's findings were affirmed by state agency physician Charles Friedman, M.D., on

7   January 23, 2006.  (Tr. at 301.)

8           On November 15, 2005, plaintiff was seen for the first time at a Kaiser

9   Permanente facility in Sacramento.  He complained of pain and swelling in his left knee, and

10  x-rays were ordered.  (Tr. at 344-45.)  On January 6, 2006, plaintiff was seen for follow-up by

11  Pradeep Mohanroy, M.D., on his complaint that his left knee pain had lasted almost two months.

12  (Tr. at 342.)  Plaintiff was treated for left knee pain and received physical therapy for his knee.

13  (Tr. at 317-46.)  On April 3, 2006, plaintiff was seen for complaints of ankle pain and "back

14  problem."  (Tr. at 314.)  Plaintiff described intermittent pain in his back but no numbness,

15  tingling, or weakness.  Dr. Mohanroy noted plaintiff's history of chronic low back pain and

16  spinal fusion surgery and observed two areas of minor keloid formation at the incision scar, with

17  no midline tenderness.  X-rays of plaintiff's right foot and lumbar spine were ordered.  (Id.)  The

18  spine x-ray showed slight degenerative changes at the right sacroiliac joint, ongoing fusion at the

19  L4 and L5 disc space, and no acute fractures.  (Tr. at 315.)  On April 11, 2006, Dr. Mohanroy

20  advised plaintiff that the lumbosacral x-rays "show satisfactory previous surgery" and to "call if

21  continued symptoms."  (Tr. at 313.)  On May 7, 2006, plaintiff went to the emergency room

22  complaining of low back pain.  Medications, including Vicodin, were prescribed.  (Tr. at 308-

23  311.)  On March 8, 2007, ten months after the emergency room visit, plaintiff was seen by Dr.

24  Mohanroy for low back pain.  (Tr. at 305-06.)  Plaintiff reported that his pain had been acute for

25  two weeks, radiating to his right leg.  He had run out of prescription medication and was taking

26  Tylenol.  Dr. Mohanroy noted that plaintiff appeared comfortable and was not acutely distressed.

He observed the keloid formation over plaintiff's incision site but found nothing remarkable otherwise.  He described the occurrence as a "flare," noted that plaintiff was not on his regular medications, and ordered an injection and pain medications.  (Id.)

On this record, the court finds that plaintiff's reliance on the January 13, 2003 report and disability status form completed by treating physician Dr. Howard is misplaced.  On that date, Dr. Howard instructed plaintiff not to lift more than 10 pounds and limited plaintiff to light work for six weeks.  (Tr. at 201-02.)  Six weeks later, Dr. Howard issued his final permanent and stationary report, which did not impose a specific weight limit with respect to lifting but precluded heavy work due to loss of approximately 50% of his pre-injury capacity for performing activities such as lifting.[9]  (Tr. at 194-95, 203.)  Although Dr. Howard amended his final permanent and stationary rating of plaintiff to a limitation to light work, he did not add a weight limit on lifting.  (Tr. at 285.)

For Social Security purposes, jobs are classified as sedentary, light, medium, heavy, and very heavy.  20 C.F.R. § 404.1567.

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).  The state workers compensation definition of light work, i.e., "the individual can do work in a standing or walking position, with a minimum of demands for

/////

---

[9]  In his job as laundry runner, plaintiff had lifted about 150 pounds ten to twenty times a day, and in his job as crew supervisor and cashier at McDonald's, he had lifted about 50 pounds two to five times a day.  (Tr. at 81-82.)

1  physical effort," does not conflict with the Commissioner's definition of light work or with the

2  ALJ's determination of plaintiff's RFC in this case.

3         The court finds that the ALJ did not mischaracterize the opinions of Dr. Howard

4  with regard to plaintiff's RFC.  Nor did the ALJ err either in finding that treating physician Dr.

5  Howard's opinions were similar to Dr. Kumar's with regard to plaintiff's capacity to perform

6  light work or in finding "a consensus of the treating, examining, and reviewing medical sources"

7  that plaintiff remained capable, except for short periods for convalescence after surgery, brief

8  flare-ups, and a short period following a knee injury, to perform light exertional work activity.

9  (Tr. at 17.) These findings are adequately supported by evidence on the record as a whole.

10         The court finds it unremarkable that the ALJ did not discuss the results of the

11  vision test administered by Dr. Kumar, since neither Dr. Kumar nor any other physician noted

12  any functional limitation caused by plaintiff's right eye blindness.  (Tr. at 290-91.)  Plaintiff did

13  not initially claim disability based on that basis, although the Social Security interviewer noted

14  that plaintiff has been almost completely blind in his right eye since birth.  (Tr. at 65, 70, 78.)  In

15  his request for reconsideration of the initial denial of his application for disability benefits,

16  plaintiff identified right eye blindness as a new illness, injury, or condition (tr. at 100), but the

17  record does not include medical evidence that the condition limits his ability to do basic work

18  activities or that he required accommodation for this condition in his past employment.  There is

19  no indication that the vision condition worsened during the time period relevant to plaintiff's

20  disability application.  In addition, the ALJ noted at the administrative hearing that plaintiff's

21  driver's license, first issued in June 2002, had no restrictions or endorsements.  (Tr. at 361.)

22         Although Dr. Kumar opined that plaintiff's ability to sit is "unlimited with proper

23  supportive chair," the court finds that the ALJ did not err by failing to discuss a chair restriction.

24  First, the ALJ did not include unlimited sitting in plaintiff's RFC.  (Tr. at 291, 15.)  Second, an

25  ALJ is not required to expressly mention each and every medical document within the

26  administrative record, or every finding in any document.  See Vincent, 739 F.2d at 1394-95

1  (noting that the Commissioner "need not discuss *all* evidence presented" but must explain why

2  any significant probative evidence has been rejected).

3         The court is also unpersuaded by plaintiff's arguments regarding the ALJ's

4  treatment of Dr. Steiner's opinion.  First, Dr. Howard considered Dr. Steiner's opinion that

5  plaintiff's disability status was best described, for workers compensation purposes, as a

6  limitation to semi-sedentary work, but declined to adopt that opinion.  Instead, he amended his

7  treating physician's final permanent and stationary report to find that plaintiff's disability

8  resulted in limitation to light work.  (Tr. at 285.)  The ALJ did not err in adopting the treating

9  physician's opinion and finding a general consensus that plaintiff could perform light work,

10  rendering a discussion of the term "semi-sedentary" unnecessary.  Nor did the ALJ err by

11  declining to pronounce plaintiff's surgery "a failed surgery" on the basis of Dr. Steiner's

12  statement that the level of function of 62% described by plaintiff's physical therapist on February

13  25, 2003 "was not a satisfactory result" (tr. at 275), when plaintiff's treating physician at Kaiser

14  found in April 2006 that "[r]ecent lumbosacral spine x-rays show satisfactory previous

15  surgery."[10]  (Tr. at 313, 315.)  Nor did the ALJ err by failing to discuss in detail Dr. Steiner's

16  speculative observations about reasons for plaintiff's inability to find other work.  (Tr. at 281.)

17         With regard to plaintiff's complaint that the ALJ failed to discuss Dr. Li's March

18  2003 opinion that plaintiff was limited to lifting no more than ten pounds, the court finds no error

19  based on the chronology of weight restrictions set forth <u>supra</u>.  Finally, the court is unpersuaded

20  by plaintiff's contention that all physicians except examining physician Dr. Kumar and the Social

21  Security reviewers felt plaintiff was limited to lifting no more than 10 pounds, which would

22  place plaintiff in the sedentary category.  Again, the 10-pound restriction was imposed for a few

23

24         [10] In addition, Dr. Howard had explained to plaintiff on January 30, 2002, prior to his surgery, that "the <u>best</u> we would hope for is an up to 80% chance of relieving up to 80% of the pain, and it's a realistic and frequent expectation to obtain only 50% improvement and consider this an acceptable degree of relief."  (Tr. at 245.)  In October 2002, Dr. Rosen believed there was "a good surgical result," and in February 2003 he noted continued improvement in plaintiff's condition and stated that the surgery appeared to be successful.  (Tr. at 198, 213.)

months in 2003 and there is no evidence supporting a conclusion that any physician imposed or intended to impose a permanent 10-pound lifting restriction.

Further, while plaintiff has discussed certain medical records and findings in considerable detail, it must be noted that the court's scope of review of decisions granting or denying Social Security disability is limited. Hall v. Sec'y of Health, Educ. & Welfare, 602 F.2d 1372, 1374 (9th Cir. 1979) (observing that Congress has mandated a very limited scope of judicial review of the Commissioner's decisions granting or denying Social Security disability benefits). The court must consider the record as a whole, considering both the evidence that supports and the evidence that detracts from the Commissioner's decision; it is not the court's role to re-weigh the evidence or substitute its own judgment for the Commissioner's. Winans v. Bowen, 853 F.2d 643, 644-45 (9th Cir. 1987). Moreover, if there is conflicting evidence supporting a finding of either disability or nondisability, the ALJ may resolve the conflict so long as there is "more than one rational interpretation of the evidence." Sprague, 812 F.2d at 1230. See also Matney on Behalf of Matney v. Sullivan, 981 F.2d 1016, 1019 (9th Cir. 1992) ("The trier of fact and not the reviewing court must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ.").

In finding plaintiff capable of performing light work, the ALJ in this case properly discharged his responsibilities of determining credibility and resolving any conflicts or ambiguities in the medical testimony. See Magallanes v. Bowen, 881 F.2d 747, 750 (9th Cir. 1989). For these reasons, the court finds that plaintiff is not entitled to summary judgment on his claim that the ALJ failed to properly credit the opinions of treating and examining physicians.

**B. Plaintiff's Subjective Symptom Testimony**

Plaintiff argues next that the ALJ failed to properly evaluate and credit plaintiff's statements regarding the nature and extent of his pain and his functional limitations.

/////

It is well established that once a claimant has presented medical evidence of an underlying impairment, the ALJ may not discredit the claimant's testimony as to the severity of his or her symptoms merely because the symptoms are unsupported by objective medical evidence. Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998); Light v. Soc. Sec. Admin., 119 F.3d 789, 792 (9th Cir. 1997). Indeed, "'the ALJ can reject the claimant's testimony about the severity of [his] symptoms only by offering specific, clear and convincing reasons for doing so.'" Light, 119 F.3d at 792 (quoting Smolen, 80 F.3d at 1281). In evaluating a claimant's subjective testimony regarding pain and the severity of his symptoms, the ALJ may, of course, consider the presence or absence of supporting objective medical evidence, along with other factors. Bunnell v. Sullivan, 947 F.2d 341, 346 (9th Cir. 1991) (en banc); see also Smolen, 80 F.3d at 1285. Absent affirmative evidence of malingering, however, the reasons for rejecting a claimant's testimony must be clear and convincing. Morgan, 169 F.3d at 599.

Questions of credibility and the resolution of conflicts in the testimony are usually deemed functions solely of the Commissioner, Morgan, 169 F.3d at 599. Determination of credibility is a function of the ALJ acting on behalf of the Commissioner. Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996). In general, an ALJ's assessment of credibility should be given great weight. Nyman v. Heckler, 779 F.2d 528, 531 (9th Cir. 1985). Ordinary techniques of credibility evaluation may be employed, and the adjudicator may take into account prior inconsistent statements or a lack of candor by the witness. Fair, 885 F.2d at 604 n.5.

In the present case, the record establishes that plaintiff's medically determinable impairments could reasonably be expected to produce plaintiff's symptoms of chronic pain and postural limitations. Accordingly, the ALJ proceeded to evaluate the intensity, persistence, and limiting effects of plaintiff's symptoms to determine the extent to which they limit plaintiff's ability to do basic work activities. (Tr. at 15.) As required when statements about intensity, persistence, and limiting effects of pain and other limitations cannot be substantiated by objective medical evidence, the ALJ made findings on plaintiff's credibility. (Tr. at 15-17.) The ALJ

1   considered plaintiff's daily activities; the location, duration, frequency, and intensity of plaintiff's

2   pain and other symptoms; the factors that precipitate and aggravate the symptoms; the

3   medication plaintiff takes or has taken for pain and other symptoms; treatment other than

4   medication received by plaintiff for relief of pain and other symptoms; any other measures used

5   by plaintiff to relieve symptoms; and all other factors in the record relevant to plaintiff's

6   functional limitations and restrictions due to pain and other symptoms arising from his

7   impairments.  (Tr. at 16-17.)

8          The ALJ found that plaintiff's asserted functional limitations are not consistent

9   with the record which shows that he has required only intermittent treatment for his back and leg

10  pain, successfully underwent back surgery and was released by his surgeon to return to light

11  work, and was found by a consensus of the treating, examining, and reviewing medical sources to

12  have recovered from his back injury sufficiently to perform light work.  (Tr. at 17.)  The ALJ

13  noted that, during physical therapy, plaintiff was using fairly heavy weights, including up to 50

14  pounds during leg presses, as well as very exertional exercise equipment, such as a recumbent

15  bicycle and an elliptical trainer.  The ALJ viewed plaintiff's strenuous physical therapy as

16  undermining his credibility regarding inability to perform light exertional activity.  (Id.)  The ALJ

17  concluded that

18          claimant's testimony that he can only stand for about 10 to 15
            minutes at a time, sit for about 30 minutes, or that he is limited to
19          lifting 10 pounds cannot be credited in view of his wide-ranging
            daily activities consisting of driving, going up and down the stairs
20          in his home multiple times daily, and those various activities which
            have been mentioned here such as doing 50 pound leg presses, his
21          lack of ongoing medical treatment, etc.

22  (Id.)

23          Plaintiff disputes the ALJ's characterization of his daily activities as "wide-

24  ranging," citing his own testimony that (1) he is unable to cook, unable to help around the house,

25  and unable to work in the yard; (2) he spends the day watching television and doing exercises;

26  and (3) he drives only for short distances, sometimes three or four times a week.  (Tr. at 361-62.)

1    Plaintiff also cites his testimony about how difficult it is for him to go up and down the stairs in

2    his home multiple times daily.  (Tr. at 369.)  Plaintiff characterizes his treatment as ongoing and

3    states that it consists of pain medication, physical therapy, steroid injections, intramuscular

4    injections, and surgery that was less than satisfactory.  He argues that he tries to perform the

5    physical therapy exercises he was instructed to do.

6            This is not a case in which there is any suggestion of malingering.  However, it is

7    also not a case in which the ALJ rejected plaintiff's statements in their entirety.  The ALJ made

8    specific findings with respect to the credibility of plaintiff's assertions concerning the limitations

9    on his ability to stand, sit, and lift.  The court finds that the ALJ fairly characterized the record

10   and sufficiently stated specific, clear and convincing reasons for not fully crediting plaintiff's

11   testimony regarding specific limitations.  See Tidwell v. Apfel, 161 F.3d 599, 602 (9th Cir.

12   1998).  Plaintiff's argument to the contrary must be rejected.  See Johnson v. Shalala, 60 F.3d

13   1428, 1434 (9th Cir. 1995) (ALJ's credibility determination would not be reversed where it was

14   based on contradictory or ambiguous evidence, including absence of medical treatment for the

15   claimant's back problem); Fair, 885 F.2d at 604 ("Where, as here, the ALJ has made specific

16   findings justifying a decision to disbelieve an allegation of excess pain, and those findings are

17   supported by substantial evidence in the record, our role is not to second-guess that decision.").

18           For these reasons, the court finds plaintiff is not entitled to summary judgment on

19   his argument that the ALJ improperly evaluated his testimony concerning his symptoms.

20   **II.  Step Four Determination of Residual Functional Capacity to Perform Past Work**

21           Plaintiff's final argument is that the ALJ erroneously found him capable of

22   performing his past work as a cashier due to improper assessment of plaintiff's RFC, failure to

23   include all of plaintiff's limitations in the hypothetical question posed to the vocational expert,

24   and failure to ask the vocational expert whether his testimony conflicted with the Dictionary of

25   Occupational Titles.

26   /////

1    The court has found that the ALJ did not fail to properly characterize and discuss

2    the medical opinions of record and did not fail to properly evaluate and credit plaintiff's

3    statements regarding the nature and extent of his pain and functional limitations.  The court

4    therefore finds that the ALJ's determination of plaintiff's RFC was proper and that the

5    hypothetical question posed to the vocational expert was not deficient in omitting the limitations

6    claimed by plaintiff.

7    The court turns finally to plaintiff's argument that the ALJ failed to ask the

8    vocational expert whether his testimony conflicted with the Dictionary of Occupational Titles

9    (DOT).  Pursuant to Social Security Ruling 00-4P, ALJ are required to inquire, on the record, as

10   to whether any testimony given by a vocational expert is consistent with the DOT.  If there is a

11   conflict, the ALJ must resolve it by determining whether the vocational expert's explanation for

12   the conflict is reasonable and justifies reliance on that expert's testimony rather than on the DOT

13   information.  SSR 00-4P, 2000 WL 1898704, at *2 (Dec. 4, 2000).

14   The Ninth Circuit has joined three other Circuits in holding that the ALJ may not

15   rely on a vocational expert's testimony regarding the requirements of a particular job without

16   first inquiring whether the testimony conflicts with the DOT.  Massachi v. Astrue, 486 F.3d

17   1149, 1152 (9th Cir. 2007).  However, the Ninth Circuit qualified that holding, noting that the

18   failure to make the requisite inquiry is harmless where there is no conflict or where the

19   vocational expert's testimony provides sufficient support to justify any potential conflict.

20   Massachi v. Astrue, 486 F.3d at 1154 n.19.[11]

21   Here, the ALJ questioned the vocational expert (VE) about plaintiff's past

22   relevant work.  The VE had reviewed plaintiff's vocational history and testified that his past

23   relevant work was in unskilled occupations and consisted of laundry runner (medium exertion

24   occupation, heavy as performed), cashier (light exertion occupation, medium as performed), and

25

26   [11]   The administrative hearing in this case was held on April 26, 2007.  The Ninth Circuit
     filed its decision in Massachi shortly thereafter, on May 11, 2007.

1    cleaner (light exertion occupation, medium as performed).  (Tr. at 376.)  The ALJ posed a

2    hypothetical question to the VE describing plaintiff, with an RFC similar to that ultimately found

3    by the ALJ, and asked whether the hypothetical person could perform any of the past work

4    performed by plaintiff.  (Tr. at 376-77.)  The VE testified that the person could do the cashiering

5    and cleaning jobs as performed in the national economy but not as performed by plaintiff in the

6    past.  (Tr. at 377.)  The ALJ did not, however, ask the VE whether his testimony was consistent

7    with the DOT.

8          Plaintiff's attorney then questioned the VE about the DOT requirements for all

9    three jobs with regard to language and reading skills, and the VE responded essentially that the

10   jobs are DOT level 2 in those areas.[12]  (Tr. at 377-78.)  Plaintiff's attorney also asked the VE

11   about the DOT postural requirements for the job of cleaner and similar jobs.  (Tr. at 378.)  The

12   VE testified that the DOT postural requirements for cleaner are "occasional."  (Id.)   In his

13   decision, the ALJ concluded that the VE's opinions are not inconsistent with information

14   contained in the DOT and adopted the VE's opinion testimony.  (Tr. at 18.)

15          By failing to specifically inquire whether there was any possible conflict between

16   the VE's testimony and information provided in the DOT, the ALJ failed to comply with the

17   requirements of SSR 00-4P and the Ninth Circuit decision in Massachi.   However, in this case

18   the error was harmless because there is no indication of any such conflict.  The only argument

19   advanced by plaintiff in this regard is that his own testimony and evidence from his treating

20   physician, Dr. Howard, indicated that plaintiff could not perform the cashier's job as described in

21   the DOT.  This argument is in turn based upon plaintiff's contention that the ALJ erred in his

22   RFC assessment by failing to properly characterize the opinions of plaintiff's physicians and

23

24          [12] The DOT defines reasoning Level 2 as:  "Apply commonsense understanding to carry
      out detailed but uninvolved written or oral instructions.  Deal with problems involving a few
25    concrete variables in or from standardized situations."  DOT App. C at 1011 (rev. 4th ed. 1991).
      Level 2 language skills require the ability to "read adventure stories and comic books" and to
26    "speak clearly and distinctly with appropriate pauses and emphasis" among other similar skills.
      Id.

24

1   failing to properly credit plaintiff's own statements.  Both of those contentions have been

2   rejected above.  Plaintiff's RFC, as properly determined by the ALJ, included the ability to

3   frequently lift and carry up to 10 pounds and occasionally lift and carry up to 20 pounds as would

4   be required to perform the work of cashier as performed in the national economy.  Whether

5   plaintiff has the ability to meet other requirements of the jobs identified by the VE was

6   adequately addressed by plaintiff's counsel in his questions posed to the VE at the administrative

7   hearing.  (Tr. at 377-78.)

8          Certainly plaintiff has not identified any potential conflict or apparent deviation

9   by the VE from the information in the DOT.  Accordingly, the ALJ's error in this regard was

10  harmless.  Massachi, 486 F.3d at 1154 n.19 (failure to follow SSR 00-4p would have been

11  harmless if there had been no conflict between the opinion and DOT); Renfrow v. Astrue, 496

12  F.3d 918, 921 (8th Cir. 2007) ("[T]he ALJ's error in failing to ask the vocational expert about

13  possible conflicts between his testimony and the Dictionary of Occupational Titles was harmless,

14  since no such conflict appears to exist."); see also Florence v. Astrue, No. EDCV 08-0883-RC,

15  2009 WL 1916397, at *9, n.12 (C.D. Cal. July 1, 2009) (any possible error was harmless because

16  "plaintiff has not identified any conflict between the vocational expert's testimony and the

17  Dictionary of Occupational Titles"); Lenocker v. Astrue, Civil No. 07-1742-ST, 2009 WL

18  1227731, at *12 (D. Or. May 5, 2009) ("That procedural error is harmless, however, because

19  Lenocker has not identified a potential conflict or apparent deviation by the VE from the

20  information in the DOT."); Miller v. Astrue,  No. Civ S-08-368 KJM, 2009 WL 800227, at *4

21  (E.D. Cal. Mar. 25, 2009) (harmless error found because "plaintiff fails to show any conflict

22  between the DOT and the vocational expert's testimony"); Lao v. Astrue, No. Civ. S-06-2714

23  EFB, 2008 WL 3863698, at *11-12 (E.D. Cal. Aug. 18, 2008) ("[T]he ALJ's failure to inquire

24  about the conflict was harmless because there was no conflict[.]").

25  /////

26  /////

**CONCLUSION**

Accordingly, IT IS HEREBY ORDERED that:

1. Plaintiff's September 30, 2008 motion for summary judgment (Doc. No. 19) is denied;

2. Defendant's November 3, 2008 cross-motion for summary judgment (Doc. No. 20) is granted; and

3. The decision of the Commissioner of Social Security is affirmed.

DATED: September 21, 2009.

_____
DALE A. DROZD
UNITED STATES MAGISTRATE JUDGE

DAD:kw
Ddad1/orders.socsec/chand0217.order